1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Frank L. Canez et al., | ) | No. CIV 02-1387-PHX-MHM |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Andrew Gastelum et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiffs, Frank L. Canez and Elizabeth Gutierrez, husband and wife, have filed a first amended complaint against Defendants Andrew Gastelum, Roger C. Hefner, and Maricopa County, Arizona. Plaintiff Frank L. Canez has asserted claims for violation of civil rights under 42 U.S.C. § 1983 (Count Five) and state or common law claims for false arrest and false imprisonment (Count One), invasion of privacy (Count Three), tortious conspiracy (Count Four), and assault and battery (Count Six) against Defendants Gastelum and Hefner. Both Plaintiffs have asserted a claim for intentional infliction of emotional distress (Count Two). Plaintiff Ms. Gutierrez also has asserted a claim for loss of consortium (Count Seven). Plaintiff Canez has sued Maricopa County based on a theory of respondeat superior. Plaintiff Gutierrez has not asserted a claim against Maricopa County. (Doc. 1, first amended complaint).

1   Defendants Maricopa County and Gastelum have filed a motion for summary

2   judgment as to all of Plaintiffs' claims (Doc. 71) and a separate statement of facts. (Doc. 72).

3   Defendant Roger C. Hefner has filed a separate motion for summary judgment and has joined

4   in the motion for summary judgment filed by co-Defendants Maricopa County and Gastelum.

5   (Doc. 81).  Defendant Hefner has filed a separate statement of facts. (Doc. 82). Plaintiffs

6   have filed responses to both motions for summary judgment (Doc. 77-78, 87-88) and

7   Defendants have filed replies (Doc. 80 & 91). The Court heard oral argument on Defendants'

8   motions for summary judgment on September 21, 2005.

9   I.

10   Background.

11   This is the second time the Court has had occasion to review this case on Defendants'

12   motions for summary judgment.  (see Order filed September 16, 2003 at Doc. 38).  Plaintiff

13   Frank L. Canez is the elected Constable for the Maryvale Justice Precinct.  Plaintiff Elizabeth

14   Gutierrez is married to Plaintiff Canez and was employed as the Civil Clerk at the Maryvale

15   Justice Court up until March 9, 2001.  At the time relevant to the events at issue, Defendant

16   Andrew Gastelum was the elected Justice of the Peace for the Maryvale Precinct. Defendant

17   Roger C. Hefner was a newly-employed security guard at the Maricopa County Justice

18   Courts having worked at the facility five days as of March 9, 2001. Defendant Hefner

19   previously had attended the Arizona Department of Public Safety and had served as a police

20   officer for approximately eight years. Defendant Hefner carried a baton and handcuffs

21   pursuant to his duties.

22   Plaintiff Canez's primary duty at the Maryvale Justice Precinct was to serve court

23   papers. (Doc. 78, Exh. 7, para. 8  - Canez affidavit). Mr. Canez has stated that he needed to

24   gain access to the clerk's work area in order to perform his job and he also needed to use

25   equipment, such as the copy machine, fax machine, etc., all of which were located behind the

26   swinging gate of the clerk's area. (id.).  It further appears that Defendant Gastelum believed

27   that Plaintiff Canez had supported Gastelum's opponent in the 2000 election.  (Doc. 78, Exh.

28

- 2 -

1 at 133). Judge Gastelum testified that he felt "a little betrayed" when he learned that

Plaintiff Canez was handing out flyers for his opponent. (id.).

During the first week of March 2001, Defendant Gastelum attended a meeting to discuss possible irregularities, including a possible breach of security and missing funds, involving the clerk's area of the Maryvale Justice Court. These incidents of alleged irregularities centered on alleged criminal activity that possibly involved the Maryvale Court Chief Clerk and an investigation involving funds missing from the clerk's area. (Doc. 72, paras.6-8). Others in attendance included Presiding Justice of the Peace Michael Osterfeld, an assistant county attorney, court administrators and officers of the City of Phoenix Police Department. At the conclusion of the meeting, Judge Osterfeld suggested Defendant Gastelum "do something" to secure the court, which, according to Defendant Gastelum, included taking steps toward securing the clerk's area and preventing unauthorized persons from coming into the court. (Doc. 72, Exh. B at 85). However, Defendant Gastelum did not issue a written order to this effect following the meeting. (Doc. 72, Exh. B at 89). It appears that Judge Osterfeld stated in an affidavit that it was his opinion that a justice of the peace had inherent power to control the court, which included restricting access to portions of the court where staff work and the court files are kept. (Doc. 72, Exh. A at 111).

An employee of the clerk's office, Celia Patrick, has stated in an affidavit that during the week before March 9, 2001, she learned from Defendant Gastelum that he did not want Plaintiff Canez to come through the gate into the clerk's work area. (Doc. 88, Exh. 3, para. 4). According to Ms. Patrick, Defendant Gastelum asked her to tell Plaintiff that he was not to come into the clerk's area but she refused. (id.).

Plaintiff testified during his deposition that on the morning of March 9, 2001, Defendant Hefner told him that he was not allowed into the clerk's area on order of "the judge", and if he did not follow the order "the judge" said he would be arrested. (Doc. 72, Exh. C at 64-65). Defendant Hefner testified during his deposition that on March 9th or the day before, "the Judge," referring to Defendant Gastelum, gave him a "directive," that is, "the Judge" said he did not wish to have anybody except employees behind the counter "including

1    the Constable". (Doc. 82, Exh. 2 at 55).  Defendant Gastelum testified in his deposition that

2    during a conversation with Defendant Hefner on the morning of March 9th, he related that

3    because of "security problems" it had been "agreed" to keep everyone from coming into the

4    clerk's area.  Gastelum testified that he asked Hefner essentially, "could you ask Canez or tell

5    Canez not to be coming in, because we need to secure the place a little better." (Doc. 82,

6    Exh. 3 at 157-58).

7        Defendant Hefner testified during deposition that "the Judge" had given an order that

8    Canez was not to cross the door. (Doc. 88, Exh. 1 at 123).  Defendant Hefner has noted in

9    his statement of facts that "[b]ecause Judge Gastelum's request to exclude Canez from the

10   administrative area in the Court house was not unreasonable, CSO Hefner was required to

11   follow Judge Gastelum's instructions." (Doc. 82, para. 10).  Defendant Hefner went "as

12   instructed" to Plaintiff Canez who was in his office near the clerk's area and "informed" him

13   of the judge's order. (Doc. 82, para. 14).  Defendant Hefner testified that he introduced

14   himself and then asked Plaintiff, "did you know that you were not allowed to go behind the

15   counter?' (Doc. 82, Exh. 2 at 66). According to Hefner, Plaintiff Canez became angry when

16   informed that he could not enter the clerk's area and said "the judge" could come tell him.

17   Defendant Hefner further testified that, upon noticing Plaintiff's angry response, Hefner said

18   he would call his supervisor to "work" this out.  (Doc. 82, Exh. 2 at 68).

19       According to Defendant Gastelum, Officer Hefner, after speaking with Plaintiff

20   Canez, returned to Gastelum and reported that Plaintiff had responded "go *** the judge."

21   (Doc. 88, Exh. 2 at 158).  Defendant Gastelum then asked Officer Hefner if they could "use

22   what they call reasonable force to eject a person, like a store owner does?" (Doc. 88, Exh.

23   2 at 158 & 173).  Gastelum testified that he asked this question to see if they could "prevent

24   him from coming in" or physically eject Plaintiff if he went behind the counter. (Doc. 82,

25   Exh. 3 at 159). According to Gastelum, Defendant Hefner replied that he would have to ask

26   his supervisor. (id.). Defendant Gastelum further testified as follows regarding this

27   conversation with Officer Hefner:

28

1

Q.  So did you tell him that 'If Canez does come through there, I want you to eject him?'

2

3

A.  No.

Q.  Did you tell him, 'If Canez comes through there, I want you to get him out of there because he will be trespassing?'

4

5

A.  No.

6

Q.  Did you tell him that 'If Canez comes through there, I want you to arrest him?'

7

8

A.  No.

Q.  You just let it sit?

9

A.  Yes.

10

Q.  So you didn't give him any kind of an order to keep Canez out of the clerks' area then, correct? ...

11

12

A.  That's correct.

13

(Doc. 82, Exh. 3 at 159-60).

14

After having been notified that he was not to enter the clerk's area, Plaintiff Canez

15

entered the restricted area allegedly in the performance of his public duties.  (Doc. 78, Exh.

16

7, para. 23).  At about this same time, Defendants Gastelum and Hefner were proceeding

17

down the hallway toward the clerk's area.  (id.).  Defendant Hefner testified during his

18

deposition that he saw Mr. Canez about to enter the restricted area. (Doc. 82, Exh. 2 at 75-

19

76).  Plaintiff Canez has stated in an affidavit that he heard Defendant Gastelum say "arrest

20

him" and that Defendant Hefner called Plaintiff by name and said, "Frank, you are arrested

21

for trespassing." (Doc. 78, Exh. 7, para. 23).  Defendant Gastelum testified that he saw

22

Plaintiff walking through the "swinging gate" into the clerk's area and Defendant Hefner told

23

Plaintiff, "[t]he judge doesn't want you going through there." (Doc. 82, Exh. 3 at 162).

24

Defendant Hefner testified that he informed Plaintiff that he had been told not to enter

25

the clerk's area but Plaintiff responded that he needed to make copies.  (Doc. 82, Exh. 2 at

26

76).  According to Defendant Hefner, "Judge Gastelum instructed CSO Hefner to arrest

27

Canez for trespassing."  (Doc. 82, para. 25; see also Doc. 82, Exh. 2 at 92).

28

1    It is undisputed that a physical confrontation occurred at the swinging gate although

2    the details of this confrontation are in dispute. Defendant Gastelum testified that Plaintiff

3    attempted to "push" his way past Defendant Hefner, and it appeared that Plaintiff "bumped"

4    him with his "left shoulder."  (Doc. 82, Exh. 3 at 162).  Defendant Hefner testified that

5    Plaintiff "shoved through the door, [and made] contact with his left arm/elbow area." (Doc.

6    82, Exh. 2 at 76).  Plaintiff states in an affidavit that as he attempted to leave the clerk's work

7    area, Defendant Hefner "blocked his exit."  (Doc. 78, Exh. 7, para. 23 - Canez affidavit).

8    Defendant Hefner testified that he verbally commanded Plaintiff to leave the clerk's area and

9    then employed force.

10    The details of the physical struggle are in dispute, including who made the first

11    physical contact, the extent of force used to effect Canez's restraint or arrest and whether

12    such force was in response to an escalating show of force or in self-defense. Plaintiff has

13    stated in an affidavit that Defendant Hefner grabbed him in a "bear hug" and threw him

14    "violently onto the floor and against the wall." (Doc. 88, para. 13). Employees of the clerk's

15    office were present and two of these employees have provided affidavit accounts of what

16    they witnessed. One of the employees has stated in her affidavit that Defendant Hefner

17    "blocked" Plaintiff as he was trying to step around the security guard and that Plaintiff

18    remained "passive." (Doc. 78, Exh. 2, paras. 4 & 6 - Rebecca Salas affidavit).  Defendant

19    Gastelum was present during the altercation and according to this same clerk's office

20    employee, he did not order the physical confrontation to cease.  (id., Exh. 2, para. 6).

21    Another clerk's office employee has stated that Plaintiff "did not even raise a finger to the

22    security guard before or during the time when he was assaulted." (Doc. 88, Exh. 3, para. 7).

23    Plaintiff Ms. Gutierrez also witnessed certain of the events of the physical confrontation

24    involving her husband on March 9, 2001.  (Doc. 78, Exh. 9, paras. 7-8).

25    During the struggle, Plaintiff Canez fell or was pushed to the floor and was physically

26    subdued by Defendant Hefner who, at some point, grabbed Plaintiff and also drew his baton.

27    Officer Hefner testified that Plaintiff struck him but denies that he physically struck Plaintiff.

28    Other security officers arrived at the scene and Plaintiff  was removed to his office which

1   was near the clerk's area.  Meanwhile, Defendant Hefner called the police.  Once in his

2   office, Plaintiff attempted to leave and again was physically subdued by Defendant Hefner.

3   Plaintiff contends he was "pushed" to the ground during this second incident. Plaintiff also

4   was handcuffed and Defendant Hefner told him he had been "arrested".  (Doc. 78, Exh. 7,

5   para. 25 - Canez affidavit).  Plaintiff remained handcuffed for thirty minutes to an hour until

6   the handcuffs were ordered removed by the head of Justice Court Security Heinz Sauermann.

7   (Doc. 78, Exh. 7, para. 26). Plaintiff Canez contends that he sustained physical and emotional

8   injury as a result of the incident.

9       On April 12, 2001, a worker's compensation injury report was completed for injuries

10  Plaintiff Canez allegedly sustained on March 9, 2001 at the Maryvale Justice Court. (Doc.

11  72, Exh. D). Plaintiff Canez did not sign the injury report. The report contains the signature

12  of the Constables Administrator Tim Modor.  Plaintiff Canez has stated in an affidavit that

13  he did not give Mr. Modor authority to sign the report and he was not aware that any report

14  had been filed on his behalf.  (Doc. 78, Exh. 10 - Canez affidavit).

15      It does not appear that Judge Gastelum had issued a written order barring employees

16  or Plaintiff Canez from the clerk's area at the time Defendant Hefner orally delivered the

17  "directive" to Plaintiff on the morning of March 9th.  Defendant Gastelum testified during

18  deposition that he did not know whether he had any authority over Plaintiff  but noted that

19  his concern was whether he had the authority to give "legal orders" "to secure the court."

20  (Doc. 88, Exh. 2 at 172).  Judge Gastelum also testified that he had no supervisory authority

21  over Plaintiff Canez who was a Constable. (Doc. 78, Exh. 1 at 27).

22      Defendant Hefner has cited to the deposition of fellow court security officers and

23  others that the officers are required to follow a judge's instructions and that a justice of the

24  peace can exclude a constable from a private work area.  (see, e.g., Doc. 82, Exh. 4 at p. 75).

25  Defendant Hefner testified that he did not know at the time how Judge Gastelum's role as an

26  elected Justice of the Peace interacted with the role of Plaintiff Canez as an elected

27  Constable.  (Doc. 88, Exh. 1 at 39). Plaintiff Canez has stated in his affidavit that Defendant

28  Gastelum had no authority to block him from entering a common work area. (Doc. 78,  Exh.

1   7, para. 22). Defendant Hefner testified that he had been given instructions by his supervisor,
2   who was "the Judge" in charge of the court, and he "followed" the instructions.  (Doc. 82,
3   Exh. 2 at 82).  Defendant Hefner also testified that he did not know of the "political discord"
4   between Judge Gastelum and Constable Canez until after the March 9th incident.  (Doc. 82
5   at para. 58).  Officer Hefner said that he felt he had been "used" by Defendant Gastelum.
6   (id.).

7        Plaintiffs have submitted the affidavit of Jo Anne Dempster, a security guard at the
8   Maryvale Justice Court.  Ms. Dempster has stated that in November 2000 "Judge Gastelum
9   ... told me personally that he wanted [Plaintiff] Elizabeth Gutierrez out of the Justice Court
10  because she was married to Frank Canez and because Frank Canez had supported Judge
11  Gastelum's opponent in the November 2000, election for Justice of the Peace."  (Doc. 78,
12  Exh. 3, para. 13).  Plaintiff Elizabeth Gutierrez has submitted an affidavit in which she states
13  that Defendant Gastelum had asked her to transfer to another court because Mr. Canez was
14  supporting Gastelum's opponent.  (Doc. 78, Exh. 9, para. 4).

15       Ms. Dempster also has stated in her affidavit that on or about February 28, 2001,
16  Judge Gastelum ordered the head of Justice Court Security to direct the Maricopa County
17  Security Command Center to cancel all of the courthouse security codes.  Also according to
18  Ms. Dempster, Judge Gastelum wanted her to arrive at work early on March 1st so that when
19  Plaintiff Canez arrived and set off the alarm, he would be arrested. Judge Gastelum told Ms.
20  Dempster to make sure Mr. Canez was handcuffed and "booked" and that he wanted Mr.
21  Canez to be "humiliated." (Doc. 78, Exh. 3, para. 15).  Ms. Dempster refused and claims she
22  was transferred the next work day to Peoria Justice Court. (id., para. 16). Judge Gastelum in
23  his deposition denies giving these instructions to Ms. Dempster.  He did testify that such
24  circumstances might be "kind of funny."  (Doc. 78, Exh. 5, pp. 53-54, 61).

25       During his deposition, Defendant Gastelum testified that prior to November 2000, he
26  wanted Plaintiff Elizabeth Gutierrez transferred from the Maryvale Justice Court because
27  there was a possibility she was giving information to political opponents who might run
28  against him in the future.  He also thought Ms. Gutierrez was a "security risk" because she

- 8 -

1   might be working on files that she should not be working on.  (Doc. 78, Exh. 5 at 36, 45).

2                                            II.

3                                Standard of Review.

4        A motion for summary judgment may be granted only if the evidence shows "that

5   there is no genuine issue as to any material fact and that the moving party is entitled to

6   judgment as a matter of law." Fed.R.Civ.P. 56(c).  To defeat the motion, the non-moving

7   party must show that there are genuine factual issues "that properly can be resolved only by

8   a finder of fact because they may reasonably be resolved in favor of either party."  Anderson

9   v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  The party opposing

10  summary judgment "may not rest upon the mere allegations or denials of [the party's]

11  pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial."

12  Rule 56(e).  See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-

13  87, 106 S.Ct. 1348, 1356 (1986).

14                                           III.

15                                    Discussion.

16       In support of their respective motions for summary judgment, Defendants contend that

17  Arizona's worker's compensation provisions provide Plaintiffs' exclusive remedy.

18  Defendants Gastelum and  Hefner both contend that they are entitled to qualified immunity

19  as to Plaintiffs' claims based on violation of constitutional rights and as to their state law

20  claims.  Defendant Gastelum contends that there is no evidence that his actions were the

21  proximate cause of Plaintiffs' injuries.  Defendant Hefner contends that there is insufficient

22  evidence to sustain the claims for intentional infliction of emotional distress and civil

23  conspiracy.  Plaintiff Gutierrez's claims for intentional infliction of emotional distress and

24  loss of consortium are essentially derivative of her husband's claims.

25       (A)    Arizona's workers compensation laws as the exclusive remedy.

26       Defendants contend that the facts of this case do not show "wilful misconduct", that

27  is, an act done knowingly and purposefully with the direct object of injuring another, so as

28  to preclude application of Arizona's workers' compensation laws. In response to Defendants'

1   argument, Plaintiffs contend that they have alleged that Defendants Gastelum and Hefner

2   acted with deliberate intent to cause injury and that their claims are exempt from Arizona's

3   workers' compensation laws.  Plaintiffs cite the Arizona Constitution, article XVIII, § 8,

4   which provides that suit is not barred where the injury is "the result of an act done by the

5   employer or a person employed by the employer knowingly and purposely with the direct

6   object of injuring another, and the act indicates a wilful disregard of the life, limb or bodily

7   safety of employees. ..."  In support of their argument, Plaintiffs contend that the facts show

8   that Defendant Gastelum ordered Defendant Hefner to arrest Mr. Canez and that the physical

9   force Hefner employed was intentional with the intent to cause injury.

10      In addition to the Arizona constitutional provision cited, under A.R.S. § 23-1022(A),

11  a provision of Arizona's Workers' Compensation Act, an exception applies for injuries caused

12  by the "wilful misconduct" of the employer or a co-employee. Under this exception, a worker

13  may elect after injury whether to claim workers' compensation or bring a civil damages

14  action against the employer.  Under A.R.S. § 23-1022(B), "[w]ilful misconduct ... means an

15  act done knowingly and purposely with the direct object of injuring another."

16      Where the acts of an employer or co-employee are of an intentional nature that they

17  could not be defined as an "accident" within the meaning of the Arizona workers'

18  compensation laws, a worker may enforce common law liability against an employer for

19  injuries not encompassed by the compensation statutes.  Irvin Investors, Inc. v. Superior

20  Court for the County of Maricopa, Arizona, 800 P.2d 979, 981 (Ariz. App. 1990)(citing Ford

21  v. Revlon, Inc., 734 P.2d 580 (Ariz. 1987)).   See Unique Equipment Co., Inc. v. TRW

22  Vehicle Safety Systems, Inc., 3 P.3d 970, 974 (Ariz. App. 1999)(citing Ford v. Revlon, 734

23  P.2d 580(action against employer for intentional infliction of emotional distress not barred

24  by workers' compensation provision)).  In Gamez v. Brush Wellman, Inc., 34 P.3d 375,  380

25  (Ariz. App. 2001), the Arizona Court of Appeals noted that "in this state, there must be a

26  'genuine intentional injury,' comparable to 'an intentional left jab to the chin.'"

27      Based on the facts discussed in the parties' memoranda on summary judgment,

28  Plaintiffs' state law claims are based on intentional conduct as distinguished from intention

1    presumed from "gross negligence".  Viewed in the light most favorable to Plaintiff, the facts

2    appear to indicate that Defendant Gastelum knowingly and deliberately sought to humiliate

3    Plaintiff Canez or cause him injury. Defendant Hefner, in allegedly arresting Plaintiff on

4    order of Defendant Gastelum, applied physical force against Plaintiff Canez in seeking to

5    restrain him at the clerk's area.  Plaintiff has stated in an affidavit that Defendant Hefner

6    grabbed him in a "bear hug," threw him "violently" to the floor and against the wall, and that

7    at one point, Plaintiff had curled himself "into a ball" to protect himself from the expected

8    blows.  A second incident during which Defendant Hefner physically subdued Plaintiff

9    occurred after Plaintiff had been removed to his office.  (Doc. 78, Exh. 7, paras. 23 & 25).

10       Defendants' motions for summary judgment based on the assertion that Plaintiffs'

11   claims are preempted or barred by Arizona's workers' compensation laws are denied.

12       (B)    The issue of Defendants' qualified immunity.

13       Defendant Gastelum contends that he is entitled to qualified immunity as to Plaintiff

14   Canez's § 1983 civil rights claim and under Arizona law as to Plaintiff's state law claims.

15   Defendant Hefner has joined in Defendant Gastelum's summary judgment motion on the

16   qualified immunity defense.

17       1.    Plaintiff's federal civil rights claim.

18       Under 42 U.S.C. § 1983, a person may assert a claim for violation of rights secured

19   by the Constitution or laws of the United States by a person acting under color of law.

20   Qualified immunity serves to shield government officials "from liability for civil damages

21   insofar as their conduct does not violate clearly established statutory or constitutional rights

22   of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 815,

23   102 S.Ct. 2727 (1982).  In considering qualified immunity claims on summary judgment, this

24   Court must take the facts in the light most favorable to the party asserting the injury and

25   determine whether the facts alleged show that the officer's [or defendant's] conduct violated

26   a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001). If no

27   constitutional right was violated, the inquiry ends.  If a constitutional right was violated, the

28   Court must determine whether that right was clearly established at the time the officer

1   violated it. Id., 533 U.S. at 201-02. A right is clearly established if a reasonable officer in

2   defendant's situation would have recognized that the conduct was unlawful. Id., at 200.

3         Plaintiff Canez has alleged in the first amended complaint that the actions of

4   Defendants Gastelum and Hefner violated his rights under the Fourth and Fourteenth

5   Amendments, specifically contending that the challenged conduct resulted in Plaintiff being

6   "falsely, maliciously and unlawfully arrested, assaulted, defamed and held up to a false light.

7   ..." (Doc. 1, first amended complaint at para. 26). Plaintiff's first amended complaint also

8   contains allegations relevant to a violation of the First Amendment. (id., first amended

9   complaint at para. 9). In his summary judgment response, Plaintiff contends that his First

10  Amendment rights to free speech and political association and his Fourth Amendment right

11  to be free from unconstitutional seizure were violated. (Doc. 77 at 8-9). Plaintiff bases this

12  claim on alleged conduct that includes Defendant Gastelum's "political animus" against him

13  and his "detention", "handcuffing" and "arrest".

14        The Fourth Amendment forbids "unreasonable" seizures. United States v. Osife, 398

15  F.3d 1143, 1145 (9th Cir. 2005). The use of force is contrary to the Fourth Amendment's

16  prohibition against unreasonable seizures, if that force is excessive as measured by objective

17  standards of reasonableness. Wilkins v. City of Oakland, 350 F.3d 949, 954 (9th Cir. 2003).

18  As discussed in Rivero v. City and County of San Francisco, 316 F.3d 857, 863 (9th Cir.

19  2002), a public employee has a First Amendment right to speak publicly on matters of public

20  concern and a government entity may not deny a person a "valuable government benefit" in

21  retaliation for that person's exercise of First Amendment rights.[1]

22        In this case, Defendant Hefner testified that he was following the "order" of Judge

23  Gastelum that Plaintiff was precluded from entering the clerk's area and that as a "security

24  officer" of the court, he was duty-bound to follow that order. Defendant Gastelum testified

25  that he asked Officer Hefner to tell Plaintiff Canez not to enter the clerk's area "for security

26

27        [1]For purposes of the present summary judgment motions, the Court has assumed
    implication of both of these elements. The parties did not provide sufficient briefing on the
28  issue, however.

- 12 -

1   reasons" but Gastelum denies giving Hefner any "order" "to keep Plaintiff out of the clerk's

2   area" or to arrest him.   It is undisputed that Defendant Hefner applied physical force as to

3   Plaintiff Canez at the swinging gate in order to bar him or remove him from the clerk's area

4   and again after Plaintiff had been detained in his office.

5       In support of his qualified immunity argument, Defendant Gastelum argues in his

6   summary judgment reply that he "had the legal authority and duty, through statute and the

7   inherent powers of the court, to implement and enforce the policy of restricting access to the

8   clerk's work area." (Doc. 80  at 6). In support of this contention, Defendant Gastelum cites

9   Arizona Code of Judicial Conduct as applying to justices of the peace and providing that they

10  "shall require staff, court officials and others subject to the judge's discretion and control to

11  observe the standards of fidelity and diligence that apply to the judge ..."   Defendant

12  Gastelum also cites In re Braun, 883 P.2d 996, 997 (Ariz. 1994), for the proposition that a

13  justice of the peace can be sanctioned for, *inter alia*, "fail[ing] to administer competently,

14  fairly and diligently the day-to-day operations of the Justice Court ...".

15      Plaintiff Canez contends that Judge Gastelum's "order" prohibiting him from the

16  clerk's area  violated the separation of powers clause of the Arizona Constitution, article III,

17  noting that  Judge Gastelum was a member of the judicial branch of state government and

18  Constable Canez was a member of the executive branch.  Plaintiff also cites A.R.S. § 22-

19  131(A) & (C) regarding the powers and duties of elected constables. Section 22-131(A)

20  provides that "[c]onstables shall attend the courts of justices of the peace within their

21  precincts when required, and within their counties execute, serve and return all processes and

22  notices directed or delivered to them by a justice of the peace of the county or by competent

23  authority."  Section 22-131(C) provides that "[c]onstables, with the consent of ... the board

24  of supervisors, may appoint deputies, stenographers, clerks and assistants necessary to

25  conduct the affairs of their offices."  Plaintiff Canez construes these provisions as allowing

26  constables to share the use of business equipment, such as copiers, fax machines, etc.,

27  necessary for the constable to conduct the "affairs of his office," as within the province of

28  the Board of Supervisors, not the justices of the peace. Plaintiff also contends that the actions

1    taken by Defendants Gastelum and Hefner interfered with his official duties as Constable and
2    thus were unlawful.

3    　　　Viewing the facts in the light most favorable to Plaintiff, there are facts on which a
4    reasonable jury could find that Defendant Gastelum's actions allegedly based on security
5    concerns were pretextual.  It does not appear that at the time of the events on the morning of
6    March 9th, Defendant Gastelum had issued a written order barring certain personnel from the
7    clerk's area.  However, Defendant Hefner delivered to Plaintiff a directive not to enter the
8    clerk's area on instructions of Defendant Gastelum.  Defendants Gastelum and Hefner then
9    had a discussion about whether force could be used to "evict" Plaintiff if he entered the
10   clerk's area but the authority to take such action was uncertain.  Nonetheless, as Plaintiff was
11   either entering or leaving the clerk's area, Defendant Gastelum allegedly told Defendant
12   Hefner to arrest Plaintiff for trespassing. Defendant Hefner employed physical force in
13   restraining Plaintiff, who allegedly remained passive, during an incident at the clerk's area
14   and during a second incident that occurred while Plaintiff was in his office. According to
15   Plaintiff's version of the facts, Defendant Gastelum believed Plaintiff had supported
16   Gastelum's opponent in an election and therefore took action against Plaintiff to remove him
17   from office and humiliate him. Officer Dempster has stated in an affidavit that on or about
18   February 28, 2001, Defendant Gastelum had asked her to participate in a scheme that, upon
19   cancellation of the courthouse security codes, when Plaintiff Canez arrived for work and set
20   off the alarm he would be arrested.  Defendant Gastelum testified that he had no supervisory
21   authority over Plaintiff, an elected Constable.  The relevant facts therefore are in dispute.

22   　　　Regarding Defendant Hefner's actions, Officer Hefner cites A.R.S. § 13-402 which
23   concerns justification in the use of physical force by "[a] reasonable person [who] believe[s]
24   such conduct is required or authorized by the judgment or direction of a competent court or
25   tribunal, ... notwithstanding lack of jurisdiction of the court ..." In addition, or possibly in the
26   alternative, Defendant Hefner appears to characterize the "arrest" as a "citizen's arrest" under
27   A.R.S. § 13-3884 which applies to "private persons." Plaintiffs point out that if Defendant
28   Hefner was acting as a private citizen, even "under color of state law", he is not entitled to

1    qualified immunity as a matter of law.  See, Kimes v. Stone, 84 F.3d 1121, 1128 (9th Cir.

2    1996)(private persons who conspire with state officials to violate constitutional rights are not

3    entitled to qualified immunity available to public officials)(citing Wyatt v. Cole, 504 U.S.

4    158, 168-69, 112 S.Ct. 1827 (1992)).  Defendant Hefner otherwise has not identified  any

5    statutory or other basis on which he possessed the authority to arrest in his capacity as a court

6    security officer. Defendant Hefner has testified that Defendant Gastelum told him to arrest

7    Plaintiff.  As previously discussed, Defendant Gastelum has denied issuing any order to

8    Defendant Hefner to preclude Plaintiff from the clerk's area or to arrest him on the morning

9    of March 9, 2001.  It thus is not clear on what authority Defendant Hefner acted.

10           The facts relevant to the degree of restraint or force exercised as to Plaintiff Canez,

11   the reasons and authority therefor, and whether Canez was "arrested", are in sharp dispute.

12   It simply cannot be determined in light of the disputed facts whether Defendants' actions

13   violated Plaintiff's constitutional rights.   Where the determination of qualified immunity

14   depends on material factual disputes, it is appropriate for a court to deny summary judgment

15   so that these disputes may be resolved by the trier of fact.  See,  Pray v. City of Sandusky,

16   49 F.3d 1154, 1160 (6th Cir. 1995)("summary judgment is not appropriate if there are factual

17   disputes involving an issue on which the question of immunity turns 'such that it cannot be

18   determined before trial whether the defendant did acts that violate clearly established

19   rights'")(quoted citation omitted). The jury, not the court, must decide the disputed

20   "foundational" or "historical" facts that underlie the qualified immunity determination.

21   Acosta v. City and County of San Francisco, 83 F.3d 1143, 1147 (9th Cir. 1996).  In addition,

22   because a claim of excessive force "nearly always requires a jury to sift through disputed

23   factual contentions, and to draw inferences therefrom, ... summary judgment ... in excessive

24   force cases should be granted sparingly." Lolli v. County of Orange, 351 F.3d 410, 415-16

25   (9th Cir. 2003).  Defendants' motions for summary judgment as to Plaintiff's civil rights claim

26   based on qualified immunity are denied.

27           2.       Plaintiff's state law claims.

28

- 15 -

1    A similar rationale applies to Defendants' assertion of qualified immunity under state
2    law.  State law immunity would only apply to Plaintiffs' state law claims and does not apply
3    to wrongful conduct under 42 U.S.C. § 1983. <u>Kimes</u>, 84 F.3d at 1128. Defendants cite
4    <u>Chamberlain v. Mathis</u>, 729 P.2d 905, 912 (Ariz. 1986), which held that "[q]ualified
5    immunity protects government officials from liability for acts within the scope of their public
6    duties unless the official knew or should have known that he was acting in violation of
7    established law or acted in reckless disregard of whether his activities would deprive another
8    person of their rights."  In <u>Kelley v. City of Mesa</u>, 873 F. Supp. 320, 333 (D.Ariz. 1994), the
9    district court explained that "[i]n Arizona, government employees are entitled to qualified
10   immunity for those acts that are 'reasonably within the employee's discretionary authority'
11   such as 'when officials are setting policy or performing an act that inherently requires
12   judgment or discretion.'" <u>Id</u>.,(quoting <u>Chamberlain</u>, 729 P.2d at 909).  These acts  "warrant
13   qualified immunity because they are necessary 'to advance important public objectives:
14   effective government administered by skilled officials.'" <u>Id</u>.

15   Plaintiff cites A.R.S. § 12-820.02 as providing the only state law immunity available
16   to Defendants.  Plaintiff has not cited any Arizona case law in support of this broad
17   proposition.  In <u>Booth v. State</u>, 83 P.3d 61, 68-69 (Ariz. App. 2004), the Arizona Court of
18   Appeals observed that § 12-820.02 had extended absolute or qualified immunity to public
19   entities in certain specified situations but seemed to note that a common law doctrine of
20   immunity remained available.

21   In this case, Plaintiff Canez has produced facts on which a reasonable jury could find
22   that Defendant Gastelum's actions toward him were based on purely personal or political
23   reasons, that is, he thought Plaintiff had supported Gastelum's opponent in a previous
24   election. As discussed above, Defendant Gastelum has denied "ordering" Defendant Hefner
25   to prohibit Plaintiff from entering the clerk's work area or to "arrest" Plaintiff. Defendant
26   Hefner has testified to the contrary in his deposition and has acknowledged using force to
27   restrain Plaintiff Canez. Genuine issues of material fact preclude entry of summary judgment
28   in favor of Defendants on their qualified immunity defense under state law.

(C)   Defendant Gastelum's argument of no proximate cause as a basis for summary judgment.

Defendant Gastelum contends that he is entitled to summary judgment because Plaintiff Canez cannot show that his actions were the proximate cause of Plaintiff's injuries. Defendant Gastelum points out that Plaintiff Canez made the decision to disregard the directive to not intrude beyond the clerk's counter and Plaintiff acted on his own initiative in engaging in physical contact with Defendant Hefner. A genuine issue of material fact exists regarding whether Defendant Gastelum "ordered" Defendant Hefner to prevent Plaintiff from entering the clerk's area and/or to "arrest" Plaintiff if he went behind the counter. Defendant's Gastelum's motion for summary judgment on the issue of proximate cause is denied.

(D)   Defendant Hefner's motion for summary judgment on Plaintiff Canez's  civil conspiracy claim.

Defendant Hefner contends that he is entitled to summary judgment on Plaintiff Canez's civil conspiracy claim because it is not supported by the evidence.  "For a civil conspiracy to occur two or more persons must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." Rowland v. Union Hills Country Club, 757 P.2d 105, 110 (Ariz. App. 1988).

Defendant Hefner contends that the undisputed facts show that he did not know until after the March 9, 2001 incident of the alleged "political discord" between Defendant Gastelum and Plaintiff.  Plaintiff points out, however, that the conspiracy in this case concerns the agreement to block Plaintiff's access to the administrative clerk's area and to use force against him as necessary. (Doc. 87 at 14). Construing the facts in the light most favorable to Plaintiff, Defendant Gastelum asked Defendant Hefner whether they could eject Canez from the clerk's area like a store owner.  Defendant Hefner answered that he did not know.  Defendant Hefner then used physical force against Plaintiff Canez when allegedly instructed by Gastelum to arrest Plaintiff despite lack of clarification on the issue of that authority. Genuine issues of material fact preclude summary judgment in favor of Defendant Hefner on the civil conspiracy claim.

1     (E)    Defendant Hefner's motion for summary judgment on
              Plaintiff Canez's intentional infliction of emotional distress
2             claim.

3         Defendant Hefner contends that he is entitled to summary judgment on Plaintiff

4   Canez's claim for intentional infliction of emotional distress.  Defendant contends that at the

5   time of the events alleged, he was acting within the course and scope of his employment as

6   a court security officer, he was following a lawful order of Defendant Gastelum, and that he

7   was assaulted by Plaintiff who "breached the peace". Defendant also contends that Plaintiff

8   has failed to demonstrate that he suffered "severe emotional distress" based on alleged injury

9   that includes humiliation, embarrassment, loss of sleep and stress.

10        "To recover for intentional infliction of emotional distress [in Arizona], a plaintiff

11  must show that the defendant's conduct was extreme and outrageous, causing plaintiff severe

12  emotional distress; physical injury need not occur." Duke v. Cochise County, 938 P.2d 84,

13  87 (Ariz. App. 1996).  A defendant must either intend to cause emotional distress or

14  recklessly disregard the near certainty that such distress will result from his conduct. Johnson

15  v. McDonald, 3 P.3d 1075, 1080 (Ariz. App. 1999).  As explained in Johnson,

16            The trial court determines whether the acts at issue are
              sufficiently outrageous to state a claim for relief; however, if
17            reasonable minds could differ about whether the conduct is
              sufficiently outrageous, the issue should be decided by a jury.
18            See Mint v. Bell Atlanta SYS. Leasing Int'l, Inc., 183 Ariz. 550,
              554, 905 P.2d 559, 563 (App. 1995).  To recover for this tort,
19            the plaintiff must show that the defendant's conduct was 'so
              outrageous in character, and so extreme in degree, as to go
20            beyond all possible bounds of decency, and to be regarded as
              atrocious and utterly intolerable in a civilized community. Cliff
21            v. Farmers Ins. Exchange, 10 Ariz.App. 560, 562, 460 P.2d 666,
              668 (1969)(quoting Restatement (Second) of Torts § 46 cmt. d).
22
    Id., at 1080.
23
          Viewed in the light most favorable to Plaintiff, there are facts indicating that Plaintiff
24
    Canez, a lawfully elected Constable, was physically restrained, subdued and handcuffed by
25
    a court security officer where the underlying facts concerning the reason and authority for
26
    that occurrence are in dispute.  Because reasonable minds could differ about whether the
27

28

1   conduct alleged is sufficiently outrageous, Defendant Hefner's motion for summary judgment
2   on Plaintiff Canez's claim of intentional infliction of emotional distress is denied.

3       **Accordingly,**

4       **IT IS ORDERED** that the motion for summary judgment filed by Defendants
5   Gastelum and Maricopa County (Doc. 71) is denied.

6       **IT IS FURTHER ORDERED** that Defendant Hefner's motion for summary
7   judgment (Doc. 81) is denied.

8       **IT IS FURTHER ORDERED** setting this case for a pre-trial status hearing on
9   Thursday, October 20, 2005  at 3:00 p.m. at which time a firm trial date will be given.

10      DATED this 29th day of September, 2005.

```
                                        Mary H. Murguia
                                   United States District Judge
```